## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

THOMAS D. CLOWER,

    Plaintiff,

                v.

PROTO LABS, INC.,

    Defendant.

Civil Action No.
1:23-cv-03316-SDG

### OPINION AND ORDER

This matter is before the Court on the Final Report and Recommendation (R&R) of United States Magistrate Judge Catherine M. Salinas [ECF 61], granting summary judgment to Defendant Proto Labs, Inc. on all of Plaintiff Thomas D. Clower's claims. For the following reasons, the R&R is **DECLINED**, Clower's objections [ECF 64] are **SUSTAINED**, and Proto Labs' motion for summary judgment [ECF 42] is **DENIED**.

## I.      BACKGROUND

This Americans with Disabilities Act (ADA) case arises out of Clower's termination from his position as a regional sales manager at Proto Labs after six months of employment. Many of the facts in the case, including the following, are undisputed: Clower has suffered for over 20 years (though he was only diagnosed in 2017) from a circadian rhythm sleep disorder of the delayed sleep phase

variety.[1] Clower's disorder makes it difficult for him to fall asleep at night or to function effectively in the morning, and worsens over time.[2] During Clower's Proto Labs tenure, which began in March 2018,[3] his disorder manifested as an inability to work during early morning hours:[4] Where Clower's colleagues might typically work from 9:00 a.m. to 6:00 p.m.,[5] Clower did not begin client meetings until 10:00 a.m.,[6] and on some days started work at 11:00 a.m. or later.[7]

For the bulk of Clower's tenure, his idiosyncratic schedule was an informal arrangement between him and his supervisor, Ryan Glenn.[8] However, in late July 2018, Glenn indicated to Clower that a doctor's note would be required to make his modified schedule official. On August 5, Clower duly provided Glenn with a letter from his somnologist recommending that Clower's work hours be shifted

---

[1]    ECF 42-2, ¶¶ 1, 7; ECF 51, ¶¶ 1, 7, 47, 48; ECF 55-1, ¶¶ 47, 48.

[2]    ECF 42-2, ¶ 2; ECF 51, ¶¶ 2, 47–48; ECF 55-1, ¶¶ 47–48. After he left Proto Labs, Clower was also diagnosed with Postural Orthostatic Tachycardia Syndrome, Ehlers-Danlos Syndrome, and Mast Cell Activation Syndrome. ECF 51, ¶ 50; ECF 55-1, ¶ 50. This case, however, revolves around his previously diagnosed sleep disorder.

[3]    ECF 51, ¶ 53; ECF 55-1, ¶ 53.

[4]    ECF 42-2, ¶ 20; ECF 51, ¶ 20.

[5]    *See* ECF 42-2, ¶ 12; ECF 51, ¶ 12. All times are given in Eastern Standard Time, in which Clower worked.

[6]    ECF 42-2, ¶ 21; ECF 51, ¶ 21.

[7]    ECF 42-2, ¶¶ 28–29, 36; ECF 51, ¶¶ 28–29, 36.

[8]    *See* ECF 42-2, ¶¶ 16, 22; ECF 51, ¶¶ 16, 22, 55, 57; ECF 55-1, ¶¶ 55, 57.

later into the day, to start "preferably not before" 11:00 a.m. and to end at 7 or 8 p.m.[9] The letter triggered a series of emails between Glenn, Glenn's supervisor,[10] and HR personnel[11] over the proposed schedule change.[12] On August 6, Glenn wrote that the requested schedule would make it hard for Clower "to be 100% efficient and effective in his role" because he would be "missing crucial morning hours during each day."[13] On August 9, an HR manager[14] notified a colleague that a decision had been made to grant the schedule change.[15] On August 16, Glenn informed his supervisor and HR that Clower's "call activity and revenue growth" were not "where we need him to be at to support his territory."[16] Clower himself never received a response to his formal request for a schedule change.[17] On August 31, he was fired.[18]

---

[9]   ECF 51, ¶¶ 60, 63; ECF 55-1, ¶¶ 60, 63; ECF 45-15, at 3.

[10]  ECF 45-3, at 83 (Clower Dep. 82:11–12).

[11]  ECF 44-1, at 77 (Allen Dep. 75:9); ECF 45-3, at 278 (Clower Dep. 278:1–3).

[12]  ECF 44-2, ¶ 34; ECF 51, ¶¶ 34, 66, 68, 70, 78; ECF 55-1, ¶¶ 66, 68, 70, 78.

[13]  ECF 51, ¶ 66; ECF 55-1, ¶ 66; ECF 44-1, at 174 (Allen Dep. Ex. E).

[14]  *Supra* note 11.

[15]  ECF 42-2, ¶ 34; ECF 51, ¶ 34; ECF 44-1, at 203 (Allen Dep. Ex. N).

[16]  ECF 51, ¶ 78; ECF 55-1, ¶ 78; ECF 44-1, at 175 (Allen Dep. Ex. F).

[17]  ECF 51, ¶ 69; ECF 55-1, ¶ 69.

[18]  ECF 42-2, ¶ 40; ECF 51, ¶ 40.

Clower sued under Title I of the ADA, 42 U.S.C. § 12101 *et seq.*, asserting four counts: (I) discrimination for failure to accommodate; (II) discrimination on the basis of an actual disability; (III) discrimination on the basis of a perceived disability; and (IV) retaliation.[19] Proto Labs moved for summary judgment on all four counts,[20] which motion the R&R recommends be granted in its entirety.[21] Clower filed objections to the R&R.[22]

## II.    DISCUSSION

A district judge reviewing an R&R has the authority to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge" under its broad discretion. *Williams v. McNeil*, 557 F.3d 1287, 1291 (11th Cir. 2009) (citing 28 U.S.C. § 636(b)(1)). Those portions of an R&R to which objections have been filed are reviewed *de novo*. 28 U.S.C. § 636(b)(1). Clower here has filed objections with two core contentions: that the R&R erred in concluding that his discrimination claims (Counts I–III) are barred by the doctrine of judicial estoppel; and that the R&R erred in concluding that his retaliation claim

---

[19]    ECF 6, at 6, 8, 9, 11.

[20]    ECF 41.

[21]    ECF 61, at 22–23.

[22]    ECF 64.

(Count IV) fails for lack of causation.[23] Clower asks undersigned to decline the R&R and deny Proto Labs' motion for summary judgment.[24]

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. A fact is "material" if it could change the outcome of the case, and a dispute is "genuine" if it "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986). In analyzing a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Judges are not to weigh evidence, determine credibility, or draw their own inferences from the facts, those being the proper functions of the jury at trial. *Id.* Here, viewing the record in the light most favorable to Clower, there are factual disputes as to each of his claims that preclude judgment for Proto Labs as a matter of law.

### A. Summary Judgment Is Denied as to Discrimination (Counts I–III).

To bring a claim for discrimination under the ADA, a plaintiff must prove that he was, at the time of his employment, a "qualified individual" within the meaning of the statute. 42 U.S.C. § 12112(a). This requirement applies to all ADA discrimination claims, regardless of legal theory. *Frazier-White v. Gee*, 818 F.3d

---

[23]  *Id.* at 7, 17.

[24]  *Id.*

1249, 1255 (11th Cir. 2016) (failure to accommodate); *Akridge v. Alfa Ins. Cos.*, 93 F.4th 1181, 1191 (11th Cir. 2024) (on the basis of actual discrimination); *Carruthers v. BSA Advert., Inc.*, 357 F.3d 1213, 1215 (11th Cir. 2004) (on the basis of perceived discrimination). The ADA defines a "qualified individual" as one who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1256 (11th Cir. 2007) (quoting 42 U.S.C. § 12111(8)). Here, Proto Labs concedes that Clower's requested accommodation—an 11 a.m.-to-8 p.m. schedule—was reasonable.[25] Thus, to prevail on his ADA discrimination claims, Clower must prove that he was able to perform the "essential functions" of a regional sales manager while working with or without such a schedule.

The R&R concluded that Clower could not have done so. More precisely, it found that he was judicially estopped—legally barred—from asserting that he was able to perform the essential functions of his job, in light of contrary statements that he made in applying for Social Security Disability Insurance (SSDI).[26] Clower objects, arguing that his factual contentions in this litigation are not inherently inconsistent with factual assertions he made in his SSDI application, and, even if they were, that he has provided a sufficient explanation for the inconsistency to

---

[25]   ECF 51, ¶ 71; ECF 55-1, ¶ 71.

[26]   ECF 61, at 27.

submit the issue to a jury.[27] Undersigned agrees, and rules that (1) Clower is not judicially estopped from asserting that he was a qualified individual under the ADA, and (2) Proto Labs is not otherwise entitled to summary judgment on Clower's discrimination claims.

### 1. Clower Is Not Estopped from Asserting that He Is a Qualified Individual.

The doctrine of judicial estoppel exists to "prevent parties from making a mockery of justice by inconsistent pleadings," *Talavera v. Sch. Bd. of Palm Beach Cnty.*, 129 F.3d 1214, 1217 (11th Cir. 1997)—to prevent a litigant from prevailing in one proceeding based on a sworn assertion and then relying on a contradictory sworn assertion to prevail in another, *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). The issue of judicial estoppel in disability cases often arises when a plaintiff asserts that he is a qualified individual under the ADA—and thus able to perform the essential functions of his job—after representing that he is too disabled to work for purposes of SSDI benefits. *See Talavera*, 129 F.3d at 1217–20 (discussing collected cases).

The applicability of judicial estoppel in such cases was clarified by the Supreme Court in *Cleveland v. Policy Management Systems Corp.*, which held that ADA and SSDI claims "do not inherently conflict" to the point where courts can

---

[27]    ECF 64, at 2–7.

presume that one precludes the other. 526 U.S. 795, 802 (1999). The plaintiff in *Cleveland* was an employee who experienced a debilitating stroke, tried to return to her old (that is, pre-stroke) job, and was fired after three months. *Id.* at 798. She subsequently applied for SSDI benefits, stating in her application that she had been fired because she "could no longer do the job in light of her condition"; that she had "not been able to work" following her termination"; and that she was "totally disabled" as of the day of her stroke. *Id.* at 799–800. Then, while her SSDI application was pending, the employee sued under the ADA, alleging that she was a qualified individual during her three-month stint at her old job. *Id.*

*Cleveland* held that even in such a case, where the plaintiff's successive legal positions seem so clearly at odds, courts cannot presume that the ADA claim is barred by judicial estoppel. As *Cleveland* explained, "there are too many situations in which an SSDI claim and an ADA claim can comfortably exist side by side." *Id.* at 802–03. As a result, even if "a plaintiff's sworn assertion in an application for disability benefits . . . appear[s] to negate an essential element of her ADA case," she must be given an "opportunity in the trial court" to provide a "sufficient explanation" for the apparent inconsistency. *Id.* at 806–07. An explanation is sufficient if, assuming that a plaintiff's statements in her SSDI application are true (or were believed by the plaintiff to be true), a reasonable jury could still conclude that the plaintiff was able to perform the essential functions of her job. *Id.*

The SSDI and ADA claims here are not clearly inconsistent in the way they were in *Cleveland*. The parties agree that Clower's SSDI application stated that he "did not feel well enough to work" at the time he accepted a position at Proto Labs;[28] that he was "extremely sick" for the duration of his tenure;[29] and that he was disabled beginning the day he was fired.[30] But a person could *feel* not well enough to work and go to work anyway. A person could be *extremely* sick, and still do his job (as Clower arguably did[31]). A person's disability could set in, theoretically, the moment he is fired (more on this below). In *Cleveland*, the plaintiff's SSDI statements were problematic because they and her ADA claim seemed mutually exclusive: Her assertion was that, for three months, she was *both* totally disabled *and* a qualified individual at the same time. By contrast, Clower's SSDI and ADA claims may seem difficult to reconcile, but they are not *inherently* inconsistent; *unlikely* to both be true, one might argue, but not *impossible*. Judicial estoppel is therefore inapplicable. *See New Hampshire*, 532 U.S. at 750 (2001) ("[A] party's later position must be 'clearly inconsistent' with its earlier position" for judicial estoppel to apply).

---

[28]  ECF 42-2, ¶ 11; ECF 51, ¶ 11; ECF 45-4, at 10.

[29]  ECF 45-4, at 10.

[30]  ECF 42-2, ¶ 44; ECF 51, ¶ 44.

[31]  Clower's work performance during his time at Proto Labs is discussed in detail in subsection II.A.2.ii.

The R&R, in concluding otherwise, seems to have given significant weight to two pieces of evidence that, in undersigned's view, do not alter the analysis.[32] First is evidence that the Social Security Administration (SSA), in granting Clower's application, deemed him disabled as of April 18, 2017[33]—well before he began his tenure at Proto Labs. Second is evidence that Clower's somnologist, in a letter submitted to the SSA on Clower's behalf, opined that Clower "was terminated by [Proto Labs][34] after struggling to perform basic responsibilities of the role for which he had been hired."[35] This evidence, though doubtless *relevant*, is not *preclusive* here for two reasons. First, judicial estoppel only bars a later inconsistent position taken *by the same party*. *See id.* at 749. Clower can only be made to answer for sworn statements he himself made. Second, as the Supreme Court stressed in *Cleveland*, a critical distinction between ADA liability and SSDI eligibility is that the latter "does not take the possibility of 'reasonable accommodation' into account." 536 U.S. at 803. Thus, "an ADA suit claiming that the plaintiff can perform her job *with* reasonable accommodation may well prove consistent with an SSDI claim that the plaintiff could not perform her own job . . .

---

[32]  ECF 61, at 27.

[33]  ECF 45-28, at 2.

[34]  ECF 45-3, at 261 (Clower Dep. 260:13–14).

[35]  ECF 45-25, at 2.

*without* it." *Id.* That is exactly the situation here: The SSA's and somnologist's view that Clower could not perform the essential functions of his job *without* an accommodation does not preclude him from asserting that he was a qualified individual under the ADA.[36]

Furthermore, even assuming the existence of a facial inconsistency between his SSDI and ADA claims, Clower has provided sufficient explanation to create a question of fact for the jury. In undersigned's view, the most dubious of Clower's SSDI assertions is that he became too disabled to work on August 31, 2018, the very day he was fired from Proto Labs. This is, at first glance, an eyebrow-raising coincidence—but it can be contextualized. The record reflects that Clower filed his SSDI application three years after the events at issue here (but well before this suit was filed),[37] without an attorney's help,[38] after putting it off "for a long time" in the hopes of "get[ting] better,"[39] and only when his condition had so deteriorated that he could no longer "financially take care of [him]self."[40] Clower testified that, in filling out the SSDI application, he found it nearly impossible to "pinpoint" a date on which he became "totally and permanently disabled," given the chronic

---

[36] ECF 64, at 2–3; *see also* ECF 45-3, at 251 (Clower Dep. 250:20–21).

[37] ECF 42-2, ¶ 44; ECF 51, ¶ 44.

[38] ECF 45-3, at 235 (Clower Dep. 234:7–13).

[39] *Id.* at 246 (Clower Dep. 245:15–16).

[40] *Id.* (Clower Dep. 245:3).

and progressive nature of his illness.[41] But, forced by the application form to pick the precise date on which he became too disabled to work, he chose the date on which he last worked a full-time job.[42] Clower may or may not convince a jury that this context resolves any apparent contradiction, but it does not make a mockery of justice to permit him to try. Clower is not estopped from asserting that he is a qualified individual for purposes of the ADA.

2.    **Proto Labs Is Not Otherwise Entitled to Summary Judgment.**

Because the R&R concluded that Clower was estopped from asserting that he was a qualified individual with a disability, it did not address Proto Labs' other arguments in support of summary judgment on Clower's discrimination claims.[43] Those arguments—which undersigned will consider here—are (*i*) that Count I fails because Proto Labs did not deny Clower's accommodation request;[44] and (*ii*) that Counts II and III fail because Clower cannot demonstrate that he would not have been terminated but for his disability.[45] These arguments are rejected in turn.

---

41  *Id.* at 266 (Clower Dep. 265:21–24).

42  *Id.* at 225–26 (Clower Dep. 224:23–225:1).

43  ECF 61, at 28 n.9.

44  ECF 42-1, at 20–21.

45  *Id.* at 21–23.

###### i.    Count I: Failure to Accommodate

First, Proto Labs asserts that it is entitled to summary judgment on Clower's failure-to-accommodate claim because there exists no "accommodation [Clower] requested that Proto Labs did not grant."[46] Clower responds that whether Proto Labs granted Clower's request for a modified schedule is a disputed fact for the jury to resolve.[47] Undersigned agrees with Clower.

The undisputed fact that Proto Labs never communicated a decision to Clower about his schedule modification request and instead fired him weeks later, on its face, supports the inference that the request was effectively denied. There is relevant collateral evidence, but it is conflicting. On one hand, Proto Labs emails show that Clower's supervisors had internally agreed to grant his request,[48] and Clower cannot recall being asked to come into work before 11:00 once his request had been submitted;[49] on the other hand, it was Proto Labs' position before the Equal Employment Opportunity Commission (EEOC) in March 2019 that Clower had been fired after Proto Labs was "unable to meet" his accommodation

---

[46]    ECF 42-1, at 21.

[47]    ECF 49, at 18–20.

[48]    *Supra* note 15.

[49]    ECF 42-2, ¶ 35; ECF 51, ¶ 35; ECF 45-3, at 186–87 (Clower Dep. 185:23–186:2).

request.[50] So, whether Proto Labs actually accommodated Clower's August 5 schedule modification request is a question of fact for a jury.

### ii.   Counts II and III: Actual and Perceived Disability

Second, Proto Labs asserts that it is entitled to summary judgment on Clower's claims that he was fired on the basis of an actual or perceived disability, because Clower "was routinely unable to perform the essential functions of his job, including generating revenue for his territory and demonstrating that he was making adequate efforts to prospect new business."[51] This is, in legal terms, an assertion that Clower cannot show "pretext" under the *McDonnell Douglas* burden-shifting framework used to probe causation in employment discrimination cases. *Akridge*, 93 F.4th at 1191. The issue of pretext arises when, in response to a plaintiff's claim that he was fired for a discriminatory reason, the employer proffers an alternative, *non*-discriminatory reason for its decision. *Id.* Under *McDonnell Douglas*, the burden then falls on the plaintiff to show that his disability *caused* his termination, by proving that the employer's proffered reason is pretextual. *Id.* at 1196. That is done by showing "*both* that the reason was false, *and* that discrimination was the real reason." *Id.*

---

50   ECF 51, ¶ 88; ECF 55-1, ¶ 88; ECF 44-1, at 186 (Allen Dep. Ex. H).

51   ECF 42-1, at 21–22.

Proto Labs' position here, then, is that Clower cannot prevail under *McDonnell Douglas* because he cannot falsify Proto Labs' proffer that he was fired for failing to "reliably report to work on a daily basis," "make 50 prospecting calls per day," and "meet his sales target."[52] Clower contests whether his performance was sufficiently poor to merit termination, and asserts that there is sufficient evidence for a reasonable jury to find that Proto Labs' real reason for firing him was discrimination.[53]

There is sufficient evidence in the record to reasonably call into question whether Clower's work performance was as sub-par as Proto Labs contends—if it was sub-par at all. Most direct is the affidavit testimony of Douglas Girard, a regional sales manager who worked on the same team as Clower.[54] Girard, whose tenure at Proto Labs extended from several years before Clower's arrival to several months after Clower's departure,[55] testified that Clower demonstrated "excellent sales," put out a "high volume" of prospecting calls and email communications with his clients, and had become "the top salesperson on our team" within two or three months of his hiring.[56] Clower has likewise testified that he received no

---

[52]  *Id.* at 21.

[53]  ECF 49, at 24.

[54]  ECF 48-1, ¶ 3.

[55]  *Id.* ¶ 2.

[56]  *Id.* ¶ 4; ECF 51, ¶ 76; 55-1, ¶ 76.

formal negative performance evaluations until August 2018,[57] that his "revenues were in line" with other regional sales managers,[58] and that he consistently out-performed his co-worker Adam Callahan, who started at Proto Labs the same day Clower did.[59] The latter two points are corroborated by Proto Labs's own sales data. Excluding March and April as months in which Clower was in training,[60] Clower's monthly revenue regularly exceeded his more experienced colleagues', sometimes by hundreds of thousands of dollars; and over the course of six months, Clower outearned Callahan every month except May and by a total of over $424,000 overall, or almost 60 percent.[61]

There is also evidence in the record that Proto Labs' proffered reasons for Clower's termination changed over time and were based on requirements that were unreasonably imposed and unequally enforced. For example, the reasons that Proto Labs now gives for firing Clower in this litigation differ somewhat from the reasons it gave the EEOC in March 2019. To the EEOC, Proto Labs stated that Clower had been fired because he could not be productive "between the hours of 6 pm and 8 pm," and because his "call level was . . . significantly lower than the

---

[57]   ECF 49-1, ¶ 22.

[58]   *Id.* ¶ 19.

[59]   *Id.* ¶ 3.

[60]   ECF 45-3, at 108 (Clower Dep. 107:10–11).

[61]   *See* ECF 45-2 (comparing actual sales).

expectation of where he should be at all stages of his training."[62] Now, Proto Labs asserts that it granted Clower's reasonable request to extend his work hours through 8 p.m., and relies in part on Clower's failure to meet revenue targets—something it did not raise before the EEOC—to justify Clower's firing.

There is also evidence that Clower's revenue goals may have been unrealistic given the unique[63] challenges he faced as the sales manager for Texas. Clower testified that his predecessor had left in December 2017, after seven years in her position, to begin working for a competitor.[64] In the process, she took a chunk of Proto Labs' clients with her, and was actively soliciting her old clients still with Proto Labs when Clower began working there.[65] Furthermore, Clower testified that a single client accounting for over a third of Proto Labs' 2017 Texas sales revenue had moved on to a different supplier by spring of 2018.[66] Despite these headwinds, Clower testified that his revenue goals were based on a projection that Texas's yearly sales revenue would *increase*, from roughly $3.5 million in 2017 to $4.5 million in 2018.[67] Clower's monthly revenue goal for his first

---

[62]    ECF 44-1, at 186 (Allen Dep. Ex. H).

[63]    *See* ECF 49-1, ¶ 9.

[64]    *Id.* ¶ 5.

[65]    *Id.*

[66]    *Id.* ¶¶ 7–8.

[67]    *Id.* ¶ 6.

month at Proto Labs, for example, was $364,000—the second-highest on his team of 17 people (for context, a yearly revenue of $3.5 million comes out to about $292,000 per month).[68] By August, Clower's monthly goal had risen to $414,000.[69]

Most significantly, there is evidence that the other sales managers on Clower's team were not held to call volume and revenue goals in the same way. Clower and Girard both testified that Proto Labs did not impose a call volume requirement on any of its other sales managers,[70] and Girard testified that he and fellow sales manager Israel Putnam often logged fewer monthly calls than Clower.[71] Proto Labs' sales data show that Clower's team members routinely failed to meet their sales goals: Callahan, for example, only met it once in the six months he and Clower worked together.[72] Proto Labs admits that it cannot identify any other sales manager that it fired for the same reasons it purportedly fired Clower.[73]

This evidence, viewed in the light most favorable to Clower, shows that Proto Labs' proffered reasons for Clower's termination are weak and inconsistent

---

[68]  ECF 45-2, at 3–4.

[69]  *Id.* at 15.

[70]  ECF 49-1, ¶ 10 (Clower); ECF 48-1, ¶ 4 (Girard).

[71]  ECF 48-1, ¶ 6.

[72]  ECF 54-2, at 3, 5, 8, 10, 12, 15.

[73]  ECF 51, ¶ 85; ECF 55-1, ¶ 85.

enough to be "unworthy of credence." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020). A reasonable jury could find that Clower's revenue and call volume goals were inequitably imposed and enforced, and that Proto Labs' changing story about Clower's inability to meet them was merely pretext for discrimination. The *McDonnell Douglas* framework, therefore, does not entitle Proto Labs to summary judgment.

Even if it did, the *McDonnell Douglas* framework is not the only way to analyze causation under the ADA at summary judgment, *McCreight v. AuburnBank*, 117 F.4th 1322, 1335 (11th Cir. 2024). Nor, in this case, is it the simplest. Under the text of the ADA, a plaintiff can always avoid summary judgment on causation if there is sufficient evidence for a reasonable jury to infer that he would not have been fired *but for* his disability. *Askridge*, 93 F.4th at 1197. And, as the Supreme Court has explained in the employment discrimination context, there is an easy way to test but-for causation: "to change one thing at a time and see if the outcome changes." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020).

Reframing the causation standard in this way simplifies the analysis here to an almost startling degree. The dispositive question is simply whether Clower would have been terminated for Proto Labs' stated reasons—irregular hours, low call volume, and weak sales record—if he did *not* have a sleep disorder that

prevented him from working a 9-to-5 schedule. *See Holly*, 492 F.3d at 1263 n.17 ("[The plaintiff] must show that his disability caused him to be late, so that [the defendant's] failure to give him any leeway in its punctuality policy, leading to his termination, amounted to termination 'because of his disability.'"). A jury would be well within the bounds of reason to answer no: to find that Clower's sleep disorder was so causally connected to his purportedly poor performance, that terminating him for poor performance was the same thing as terminating him for being disabled.

It would be hard for Proto Labs to quibble with such a finding, because the idea that Clower was fired for performance failures caused directly by his disability is its theory of the case. It is none other than Proto Labs that urges undersigned to connect the evidentiary dots between Clower's medical condition and his termination: to see how "Clower's medical condition impacted his ability to work anything near normal business hours";[74] how Clower's non-normal business hours prevented him from "mak[ing] 50 prospecting calls per day";[75] how making more prospecting calls is "directly correlated" with increasing sales

---

[74] ECF 65, at 4.

[75] *Id.*

revenue;[76] and how it was Clower's "fail[ure] to sufficiently prospect new business and generate revenue" that led to his termination.[77]

Nor can Proto Labs avoid liability here by merely "citing some *other* factor that contributed to its [ ] employment decision," because an event can "have multiple but-for causes." *Bostock*, 580 U.S. at 656. It is not enough, in other words, for Proto Labs to assert that Clower was fired for poor performance, if a reasonable jury could find that Clower's poor performance and disability were *both* but-for causes of his termination. Summary judgment as to all three of Clower's discrimination claims is accordingly denied.

### B.    Summary Judgment Is Denied as to Retaliation (Count VI).

That leaves Clower's retaliation claim, on which the R&R recommends summary judgment in Proto Labs' favor for Clower's inability to show causation under *McDonnell Douglas*. Clower responds, much like he did in the discrimination context, that the record contains sufficient evidence both to rebut Proto Labs' contention that it fired him for poor performance, and to permit the inference that the real reason he was fired was retaliation.

An ADA retaliation claim has three elements: (1) a protected activity, (2) an adverse employment action, and (3) a causal connection between them. *McCreight*,

---

[76]    *Id.* at 21.

[77]    *Id.* at 20.

117 F.4th at 1339. There is no dispute that Clower's request for a schedule change was a protected activity, and that his termination was an adverse employment action. The only question, therefore, is whether Clower can show that he would not have been fired *but for* his request.

The answer, quite clearly, is yes. Clower's retaliation narrative is as simple as it is undisputed. For the first five months of his time at Proto Labs, he never received a negative performance review or any other formal reprimand.[78] During those first five months, there is no evidence that Proto Labs internally discussed his call volume requirements, revenue goals, or any other aspect of his performance. On August 5, Clower asked for a schedule change. *The very next day*, on August 6, Glenn informed his supervisor and Proto Labs' HR over email that the schedule change would negatively impact Clower's performance.[79] Ten days later, Glenn sent another email, this time including documentation of Clower's negative performance.[80] Nine days after that, Clower was fired. That is enough to create an issue of fact for trial. There is no need to resort to the doctrinal "minutiae" of *McDonnell Douglas* when the sufficiency of the evidence is so readily apparent.

---

[78]   ECF 51, ¶ 84; ECF 55-1, ¶ 84; ECF 49-1, at 22.

[79]   ECF 51, ¶ 66; ECF 55-1, ¶ 66; ECF 44-1, at 174 (Allen Dep. Ex. E).

[80]   ECF 51, ¶ 78; 55-1, ¶ 78; ECF 44-1, at 175–183 (Allen Dep. Ex. F).

*Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 952 (11th Cir. 2023) (Newsom, J., concurring). Summary judgment on Clower's retaliation claim is denied.

## III.    CONCLUSION

The R&R [ECF 61] is **DECLINED**, and Clower's objections [ECF 64] are **SUSTAINED**. Proto Labs' motion for summary judgment [ECF 42] is **DENIED**. The parties are **ORDERED** to file their joint proposed pretrial order by April 30, 2025. The parties are further **ORDERED**, by April 30, 2025, to each file any necessary Notice of Leave of Absence for conflicting dates through the rest of the calendar year. The trial and pretrial conference will be scheduled thereafter without further notice.

**SO ORDERED** this 31st day of March, 2025.

Steven D. Grimberg
United States District Judge